**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

USDC - GREENBELT
'24 FEB 13 AM 8:53

NATHANIEL WILLIAMS,     )
      )
    Plaintiff,     )
      )    Civil Action No. 1:23-cv-0166-LKG
v.     )
      )    Dated: February 12, 2024
YES CARE CORP., *et al.*,     )
      )
    Defendants.     )
      )

## MEMORANDUM OPINION

Self-represented plaintiff Nathaniel Williams, a state inmate currently confined at Eastern Correctional Institution ("ECI"), filed this amended civil rights complaint pursuant to 42 U.S.C. § 1983, against Yes Care Corp.; "ECI Medical;" Sarah Johnson, R.N.; Dr. Clem, M.D.; Dr. Metera, M.D.; Dr. Raab, M.D.; and Stephanie Cyran, CRNP. ECF No. 5. Williams seeks monetary damages for constitutionally inadequate medical treatment. *Id.*

In response to the Amended Complaint, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 15. Williams was advised of his right to file an opposition response to Defendants' Motion and of the consequences for failing to do so. ECF No. 16. Williams filed an opposition response, to which the Defendants replied. ECF No. 20, 22. The Court has reviewed the pleadings and finds a hearing unnecessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons stated below, Defendants' Motion, construed as one for summary judgment, shall be **GRANTED**.

## I. Background

### A. Williams' Amended Complaint

Williams filed an Amended Complaint which serves as the operative Complaint in this matter. ECF No. 4, 5. Williams states that on June 25, 2022, he "badly injured" his right leg. ECF No. 5 at 2. He states that "significant pain and trauma occurred, to where [his] entire leg was bruised and swollen [two] times the size of [his] other leg and it was easily visible and bent abnormally." *Id.* He was carried to the medical department because he could not walk independently. *Id.* Upon arrival he was examined by Defendant Sarah Johnson, R.N., who

"looked at [his] leg only visually and said she didn't believe it was broken, probably just bruised." *Id.* at 2-3. Nurse Johnson provided four Motrin pills, an ace bandage, and crutches. *Id.* at 3. Williams was assigned a "top tier and a top bunk" and was unable to independently get into his bed. *Id.* He states that the swelling worsened, he could not sleep, and he was in extreme pain. *Id.* Given the pain and the fact that he "could not physically move or bend [his] leg on its own," he believed the leg was broken. *Id.*

The following day, June 26, 2022, he asked to return to medical. *Id.* Again, he saw Nurse Johnson, who stated that the swelling had improved although, in Plaintiff's view, it had not. *Id.* Williams asked to go to the emergency room because he believed the leg was broken, but Nurse Johnson stated that she thought it was only bruised. *Id.* She provided a blister pack of Motrin, stated he would be given an x-ray when the technician comes in, and sent him back to his tier. *Id.*

Williams spent June 27 and 28, 2022 in "excruciating pain" and was unable to sleep. *Id.* He was not called either day for x-rays to be done. *Id.* On June 28, 2022, he again requested to be sent to medical, and was sent immediately because he could "barely get around even with crutches." *Id.* at 3-4. There, he saw Dr. Metera who performed a physical evaluation, and stated that the leg was likely broken, or possibly an ACL or MCL tear, given the swelling and very limited range of motion. *Id.* at 4. Dr. Metera recommended moving Williams to the ECI infirmary so that he could be provided a stronger pain medication and x-rays could be completed. *Id.* Williams "asked and requested[] to be sent to the ER, for immediate medical treatment, but Dr. Metera stated they could not because of their policy." *Id.*

Williams was taken to the infirmary at ECI, but still did not receive an x-ray until July 5, 2022. *Id.* While there, he asked to go to the emergency room several times but Dr. Raab and Nurse Stephanie Cyran told him he could not go due to some unspecified policy. *Id.* On July 7, 2022, Nurse Cyran gave Williams the results of his x-ray, which confirmed that his tibia was displaced and fractured in three places. *Id.* He asked to go to the ER, but the request was refused, and he remained in the infirmary. *Id.*

On July 20, 2022, Williams was taken to Johns Hopkins Hospital to meet with an orthopedic surgeon. *Id.* at 5. "Upon evaluating [Williams'] leg, he was shocked to see how bad a shape [his] leg was in, and that [Williams] hadn't been brought in immediately when the accident happened." *Id.* The surgeon told Williams that with an injury of this nature he "could

have lost [his] leg." *Id.* The surgeon wanted an immediate CT scan but could not get one because approval was needed from ECI. *Id.* On July 22, 2022, Williams received the CT scan. *Id.*

On July 28, 2022, Williams had surgery. *Id.* He states that he waited "so long for surgery that the bone [began] to heal incorrectly fusing back together" and the surgeon had to "rebreak the bone…due partially because of bone fusing wrongly." *Id.*

On August 11 and 12, 2022, Williams complained to Dr. Clem that his wound smelled badly and was "oozing yellowish secretions" and he was experiencing "dizziness and lightheadedness." *Id.* at 5-6. His complaints were ignored, and he was discharged from the infirmary on August 18, 2022. *Id.* at 6. On August 24, 2022, Williams saw Dr. Metera in the medical department, who confirmed the wound was infected and prescribed antibiotics. *Id.* at 6. He states that his surgeon requested a follow up appointment in October 2022 which never occurred. *Id.*

Williams states that, as of February 15, 2023, he was still recovering and required crutches and a leg brace. *Id.* at 5. He states that the "egregious nature of the handling of" his injury violates his Eighth Amendment right to adequate medical care. *Id.* at 6. He argues that "delaying and denying medical attention has caused extensive pain and suffering both mentally and physically, along with the fact that [he] may never walk the same, and 8 months later [he] is still on crutches and [has] not been taken for follow-up in 5 months." *Id.*

**B.      Defendants' Response**

The Defendants argue that they were not deliberately indifferent to Williams' serious medical needs, and at all times provided appropriate care. ECF No. 15-1. In support thereof, they include medical records, declarations, and other record evidence.

Williams' medical record reflects that he was escorted in a wheelchair to the medical department on Saturday, June 25, 2022, because he "jammed" his lower right leg "while chasing fly balls." Med. Records, ECF No. 15-13 at 61. He was evaluated by Nurse Johnson. *Id.* Nurse Johnson's notes reflect that although Williams was in moderate distress and complaining of severe pain, his vital signs were stable, and he had positive capillary refill in his right big toe. *Id.* She noted that the limb was swollen and warm to the touch. *Id.* Nurse Johnson ace wrapped and iced the leg, provided Motrin to Williams along with four additional doses for later use, and provided crutches. Med. Records, ECF No. 15-14 at 1. She also noted that Williams was

scheduled for a provider sick call visit on Monday. *Id.* Nurse Johnson believes that she "spoke to an on-call provider during or right after this encounter because crutches cannot be issued without a doctor's order, and [Williams] did receive crutches." Decl. Sarah Johnson, ECF No. 15-20 at 3.

The following day, Williams again saw Nurse Johnson for complaints of increased swelling and pain. ECF No. 15-13 at 60. She noted that he was in "mild distress," had positive capillary refill, and that the swelling had increased. *Id.* She re-wrapped the knee and provided Motrin and Tylenol. *Id.* Williams again saw Johnson on June 28, 2022, for a sick call. *Id.* at 58. She noted that Williams believed the swelling had increased and that the leg was broken. *Id.* Williams' vital signs were stable, and Johnson noted he was mildly distressed. *Id.* She noted that in her opinion, swelling had decreased, but she did note new discoloration of Williams' heel. *Id.* According to nurse Johnson, "[n]ew right heel discoloration is an indication of the death of red blood cells, which is a sign of an injury (although not necessarily a sign of a fracture)." ECF No. 15-20 at 4. Therefore, she "contacted Dr. Paul Matera and asked him to see the patient, which he did." *Id.*

Nurse Johnson states that "[a]s an RN, I do not have the authority or ability to order any patient to the hospital, as only a mid or upper-level provider can make that order. In addition, as an RN I cannot order any diagnostic testing such as an x-ray or prescribe any medications, although I am able to give over-the-counter pain medications such as Motrin and ibuprofen, which I did in this case." *Id.* at 2. Further, she avers that "[w]hen [she] saw the patient, [she] did not believe that his leg was broken, as [she] could not detect that it was broken through range of motion tests. If [she] had believed the leg was broken, [she] would have informed the on-call provider and requested further instructions." *Id.* at 4.

Later on June 28, 2022, Williams saw Dr. Paul Matera. ECF No. 15-3 at 55. Dr. Matera noted that Williams could barely bear weight, the area was tender, he described his pain as a 7/10, his Achilles was intact, "and the right calf was three centimeters greater than the left, with no cords, no Homans, positive anterior drawer, no Bakers," and positive edema to the right leg. *Id.*; Decl. of Dr. Paul Matera, ECF No. 15-18 at 3. Dr. Matera states that "[t]he positive anterior drawer test suggested a possible ACL injury, which is not usually repaired acutely." ECF No. 15-18 at 3. Further, Williams was "distally neurovascularly intact, so there was no concern of any clotting or vascular injury." *Id.* At the time, Dr. Matera's differential diagnosis "was

possible bruise, fracture, or ligament/tendon injury," so he "wrote a diagnosis of right knee internal derangement (typically meaning a ligament or tendon issue)," but he could not make a definitive diagnosis without further testing, so he ordered an x-ray to rule out a fracture. *Id.*

Dr. Matera states "I did not send [Williams] to the hospital when I saw him because his injury was not an emergency … even if x-rays had been done that day and showed the fracture, I still would not have sent him to the hospital because the type of fracture he had is not the type that requires emergency surgery." *Id.* at 4. In addition to ordering the x-rays, Dr. Matera admitted Williams to the infirmary, prescribed Percocet and ibuprofen, continued the use of crutches, and instructed Williams to remain non-weight bearing and ice the leg twice daily. ECF No. 15-13 at 55.

The following day, Williams saw Dr. Clayton Raab in the infirmary during provider rounds. *Id.* at 47. Dr. Raab noted that Williams reported the pain had improved, but the swelling had not changed. *Id.* He noted tenderness to portions of the knee, but states that the "knee seems to be intact by testing albeit limited." *Id.* Dr. Raab noted that x-rays and ibuprofen were ordered already, and that there would be "[n]o XRAY today unfortunately." *Id.* He stated that Williams was to remain in the infirmary until he was able to obtain x-rays and "ambulate better." *Id.*

Williams saw Dr. Raab again on June 30, 2022. *Id.* at 38. Dr. Raab noted that Williams continued to experience pain in his knee, but that swelling had reduced "an estimated 25% since [Dr. Raab] examined him" the day before. *Id.* Dr. Raab planned for an x-ray "as soon as they can do it." *Id.* Dr. Clem explained that "[t]he physicians at ECI can order x-rays but do not control when the x-rays will take place. X-ray technicians typically come twice per week to take x-rays, but the physicians cannot control when the technicians come to the facility." ECF No. 15-2 at 5.

Williams saw CRNP Stephanie Cyran in the infirmary for provider rounds on July 1, 2, 3, and 4, 2022. ECF No. 15-3 at 12, 14, 24, 27. On July 1, 2022, CRNP Cyran's notes indicate that Williams had some bruising on his knee and shin, was able to wiggle his toes, had a strong pedal pulse and no complaints of nerve tingling. *Id.* at 28. She continued pain medication, advised him to avoid weight-bearing activities, and reviewed the time frame to obtain an x-ray, noting that there was a "likelihood that pain and injury will take time to resolve and may not resolve completely." *Id.* On July 2, 2022, CRNP Cyran examined Williams and continued his pain medication regimen. *Id.* at 26. On July 3, 2022, CRNP Cyran noted "on assessment today,

[patient] up and out of bed, utilizing crutches, no new complaints or medical issues to address today, continue current plan of care." *Id.* at 14. On July 4, 2022, CRNP Cyan noted "no acute distress, sitting in chair watching tv, both legs are bent … continue plan of care." *Id.* at 12.

On July 5, 2022, an x-ray was done of Williams' right tibia and fibula. Med. Records, ECF No. 15-17 at 44. The x-ray found that there was "acute intra-articular fracture involving proximal metadiaphysis of tibia with mild displacement[,]" the "fracture extends into the tibial plateau[,]" and there was "associated joint effusion" but "no evidence of dislocation." *Id.* Thereafter, Williams saw CRNP Cyran on July 5, 2022, for a scheduled provider visit. Her notes indicate that the x-ray showed "fractures in three places." ECF No. 15-12 at 54. She reviewed the findings with the medical director, generated a consult for orthopedics, requested a renewal of Percocet, and instructed that Williams should continue his infirmary stay, elevation of the leg, and the use of crutches. *Id.*; ECF No. 15-13 at 4.

Williams saw CRNP Cyran in the infirmary during provider rounds on July 6, 7, 8, 9 and 10, 2022. ECF 15-12 at 45-46, 34, 24, 18, 5. At each visit, Williams was assessed, and medications and the plan of care were reviewed with Williams. *Id.* On July 7, 2022, CRNP Cyran reviewed the x-ray results and medication regimen with Williams and provided an informational orthopedics handout from the Johns Hopkins Hospital website for possible treatment plans. *Id.* at 34. Her notes reflect that Williams understood he would be going offsite for treatment, likely within the next seven to 14 days. *Id.* On July 7, 2022, Williams was approved for an orthopedics evaluation. *Id.* at 33. On July 9, 2022, CRNP Cyran's notes reflect that Williams was informed that he had been scheduled for an assessment visit with orthopedics, and although the date was known to CRNP Cyran, she did not disclose the date to Williams "for security reasons." *Id.* at 18.

Williams saw Dr. Clem in the infirmary on July 11, 2022. *Id.* at 53-54. Dr. Clem "noted the patient had been splinted, was non[-]weightbearing on crutches, and on NSAIDs/Tylenol/Percocet with good control. On the exam, there was swelling near and around the fracture area, but no warmth or erythema. The patient was able to move the ankle without pain. He was neurovascularly intact distally and scheduled for an orthopedics visit on July 19. Overall, the patient was stable, and [Dr. Clem] continued the plan of care." Decl. of Clem, ECF No. 15-2 at 7.

On July 12, 13, and 14, 2022, Williams saw Dr. Raab in the infirmary for provider rounds. ECF No. 15-11 at 48, 31, 29. On July 12, 2022, Dr. Raab noted that the "knee is much less swollen" than when Dr. Raab saw Williams two weeks prior. *Id.* at 48. At this appointment Williams complained about his pain, and Dr. Raab "reviewed pain management" and prescribed ibuprofen with Tylenol for breakthrough pain. *Id.* On July 13, 2022, Dr. Raab noted Williams was doing "very well overall" and that "pain is OK on meds." *Id.* at 31. On July 14, 2022, Dr. Raab advised Williams his orthopedics appointment was approaching. *Id.* at 29. He also noted that the way Williams was wearing his ACE bandage was functioning as a tourniquet, which may have been contributing to the swelling Williams was experiencing. *Id.* Dr. Raab recommended that Williams "use the ACE only if he feels he truly needs this" and the plan of care was otherwise continued. *Id.*

On July 15, 2022, Williams saw CRNP Cyran in the infirmary. *Id.* at 13. Leg swelling was "greatly improved" and Williams had "no new complaints" so the plan of care was continued. *Id.*

On July 19, 2022, Williams saw Dr. Babar Shafiq at Johns Hopkins orthopedics for an evaluation. ECF No. 15-17 at 45. Dr. Shafiq noted that he met with and evaluated Williams and noted that Williams "will need operative repair." *Id.* at 47. He indicated that a CT scan would be "very helpful to determine which fragments require fixation," but because Williams was incarcerated, the CT scan would need to be "planned with the facility." *Id.* He stated "hopefully we get that done as soon as possible so we can schedule surgery within the next 1 week." *Id.* Further, Dr. Shafiq recommended ibuprofen, Tylenol, ice, elevation, a knee immobilizer, and the use of crutches. *Id.*

On July 20, 2022, Williams saw CRNP Cyran for a provider visit. ECF 15-10 at 17. On that date, CRNP Cyran requested a CT of Williams' leg, with a request that the CT be expedited. *Id.* She also requested that surgery occur in approximately one week as recommended by Dr. Shafiq. *Id.* Her requests for a CT scan and surgery were both approved that day. *Id.* at 16, 25.

On July 21, 2022, Williams saw Dr. Raab in the infirmary. ECF 15-10 at 7. Dr. Raab's notes indicate that both the CT scan and surgery had been scheduled, which he told Williams. *Id.* No new concerns were noted. *Id.* Williams underwent the CT scan later that day, which showed a "mild displaced fracture of the proximal tibia." ECF 15-17 at 33-34. On July 22,

2022, Williams saw CRNP Cyran in the infirmary.  ECF 15-9 at 48.  No new concerns were noted, but CRNP Cyran's note reflects that Williams' surgery was scheduled.  *Id.*

Williams saw Dr. Raab in the infirmary on July 25, 26, and 27.  ECF No. 15-9 at 26, 24, 17.  On July 25, 2022, swelling was reduced, no new concerns were noted, and Williams was cleared for "any planned general or local anesthetic procedure felt needed to repair his fractured tibia."  *Id.* at 26.  On July 26, 2022, Williams was "stable awaiting surgery" and had "more questions on his injury" which he discussed with Dr. Raab "at length."  *Id.* at 24.  On July 27, 2022, Williams was experiencing increased pain, so Dr. Raab provided Percocet.  *Id.* at 17.  Dr. Raab stated that "[t]he waiting for the surgery is getting to him," but noted that Williams was "optimal for the upcoming planned surgery."  *Id.*

The following day, July 28, 2022, Williams was admitted to Johns Hopkins Hospital for surgery, where he remained until discharge on July 31, 2022.  ECF No. 15-15 at 33-54.  He was scheduled for follow up with Dr. Shafiq on August 9, 2022.  *Id.* at 33.  On August 1, 2022, Williams returned to ECI (ECF No. 15-9 at 12) and upon arrival Dr. Clem prescribed oxycodone for pain and an injectable medication to prevent clotting following surgery.  ECF No. 15-2 at 11.  Thereafter, Williams saw Dr. Raab in the infirmary.  ECF No. 15-9 at 1.  Dr. Raab noted that Williams was stable following surgery, and the knee was wrapped in Ace bandages and a knee immobilizer.  *Id.*

Williams again saw Dr. Raab on August 2, 2022.  ECF No. 15-8 at 40.  The dressing was removed and Dr. Raab noted that "the wound is pristine" with "all staples intact and no erythema anywhere on both incisions to suggest infection."  *Id.*  Williams was stable and encouraged to get out of the bed and work the knee while in bed to get increased range of motion.  *Id.*  Williams next saw Dr. Raab on August 4, 2022, at which time he reported that "feels he is immune to the effects of [two] percocets and is asking for dilaudid."  *Id.* at 13.  Dr. Raab's note indicates that Williams' leg looked very good and was unchanged from the previous day, so he "question[ed] why at this late date" Williams was requesting increased pain medications.  *Id.*  Dr. Raab continued Williams on his current regimen and indicated pain medication would need to be addressed by the doctors at Johns Hopkins at Williams' follow up visit.  *Id.*

Williams saw Dr. Raab again on August 8, 2022.  ECF No. 15-7 at 36.  Williams admitted to standing on his right leg, and Dr. Raab noted that he questioned how well Williams was able to stay off the leg "when showering etc."  *Id.*  Dr. Raab noted that "[p]ain meds are

becoming an issue" and Williams continued to express that he needed "even more pain meds." *Id.* Dr. Raab noted that "it has been explained to him at this late date with his leg looking so good he should be having much less pain as long as he stays off the leg." *Id.* Williams was able to move through nearly a full range of motion and was told he would be scheduled with physical therapy. *Id.* His follow up appointment was scheduled for the following day, and Dr. Raab indicated they could address his pain then. *Id.*

On August 9, 2022, Williams had his post operative visit with Dr. Shafiq at Johns Hopkins. Med. Record, ECF No. 15-17 at 28. Dr. Shafiq noted that Williams was recovering very well with minimal pain, apart from some decreased sensation around the incisions in the leg. *Id.* The incisions were noted to be clean, dry, and intact with no erythema, drainage, or signs of infection. *Id.* At this visit, sutures/staples were removed, and steri-strips were applied. *Id.* Radiographs of the right knee were taken and demonstrated that the hardware was in place without breakage or migration and the fracture was healing appropriately. *Id.* Dr. Shafiq reviewed medications and pain management with Williams. *Id.* Dr. Shafiq recommended removing the steri-strips in 3-5 days, following up in four weeks, remaining non-weightbearing for 10 weeks after surgery, and utilizing knee range of motion as tolerated. *Id.* at 29. Dr. Shafiq issued a referral for physical therapy. *Id.*

On August 10, 2022, CRNP Cyran updated Williams' chart, reviewed the discharge summary with Dr. Clem, and submitted consultation requests for physical therapy and a follow up appointment with Dr. Shafiq as recommended. ECF No. 15-7 at 4. Dr. Clem saw Williams in the infirmary, and noted that Williams was wearing his brace, working on range of motion, was not experiencing new pain, and was "happy with progress." *Id.* at 7. On August 11, 2022, Dr. Clem again saw Williams in the infirmary. ECF No. 15-6 at 44. The brace was in place, swelling was minimal, range of motion was increasing, and they planned to taper pain meds and increase activity. *Id.* Williams was stable and the plan of care was continued. *Id.* Dr. Clem attests that Williams' "allegation that the wound smelled bad and was oozing yellowish secretions at this encounter and was likely infected is patently false. In addition, he did not complain of dizziness or lightheadedness, or [Dr. Clem] would have noted it." Decl. of Clem, ECF No. 15-2 at 14. Dr. Clem again saw Williams on August 12, 2022. Med. Records, ECF No. 15-6 at 33. Again, Dr. Clem states that Williams "was stable with a brace, minimal swelling, and no redness. He had good pain control despite his complaints to the contrary, as his

activity, sleep, and behavior all pointed to good pain control." ECF No. 15-2 at 14. Again, there was no yellowish discharge, or complaints of lightheadedness or dizziness or Dr. Clem "would have noted it." *Id.*

Williams saw CRNP Cyran in the infirmary for provider rounds on August 13, 2022. ECF No. 15-6 at 29. She noted that his skin was "healing well overall." *Id.* Williams indicated that the reduced pain medication was not effective, and CRNP Cyran increased his Gabapentin dosage. *Id.* The plan of care was reviewed with Williams. *Id.* Williams again saw CRNP Cyran on August 14, 2022. *Id.* at 20. No new complaints were noted, and the plan of care was continued. *Id.* On August 15, 2022, Williams saw Dr. Clem, who noted that the brace may need some padding near the incision site to prevent breakdown. *Id.* at 15. Williams "had many questions about pain medications again and told [Dr. Clem] that normal doses are not enough for him . . . [Dr. Clem] noted that it was peculiar that the patient said the pain medications not working to control pain was the reason he was not taking them. Notably, the orthopedist did not recommend any opioid pain medications for the patient at the most recent follow-up." ECF No. 15-2 at 15. Dr. Clem adjusted his medications, placing him on NSAIDs and Tylenol, with Percocet as needed for a few days. ECF No. 15-6 at 2.

Dr. Clem saw Williams again on August 16, 2022. ECF No. 15-5 at 47. Williams had good pain control, was aware that the use of Percocet would be discontinued soon, was increasing activity, and doing well with a walker. *Id.* Dr. Clem "noted that [Williams] would likely be discharged tomorrow and be placed on bedrest with feed-in until his orthopedics follow-up." ECF No. 15-2 at 16. Williams' "incision line was clean, dry, and intact with minimal swelling, and [he] was neurovascularly intact." *Id.*

On August 17, 2022, Williams was discharged from the infirmary to bed rest in a bottom-bunk with a "feed in" status. ECF No. 15-5 at 45. At discharge, Dr. Clem noted Williams had undergone surgery 20 days ago without complication and had been steadily increasing activity and strength. *Id.* He was stable for discharge with the following limitations: bed rest, bottom bunk, feed-in status, knee brace, and crutches until cleared. *Id.* Dr. Clem attests that Williams' "incision was not infected when I discharged him from the infirmary as he claims." ECF No. 15-2 at 16.

On August 24, 2022, Williams saw Dr. Matera, who indicated that Williams was "doing well on crutches." ECF No. 15-5 at 41. Williams had slight serosanguineous discharge along

the incision line, but no purulent discharge. *Id.* "Dr. Matera's note does not indicate that the patient's incision was infected as he claims. Serosanguineous discharge by itself is not a sign of infection, whereas purulent discharge is." ECF No. 15-2 at 16. Dr. Matera ordered an antibiotic for seven days with daily bandage changes by nursing. ECF No. 15-5 at 41. Williams saw Dr. Matera again on August 30, 2022, and at that time, it was noted that Williams had no new complaints, felt well, was getting daily bandage changes with no increase in discharge, no soft tissue swelling, and no fever. *Id.* Dr. Matera ordered a bandage and continued daily dressing changes by nursing until well-healed. *Id.* "Dr. Matera noted there was no dehiscence, indicating the incision was still intact." ECF No. 15-2 at 17.

On September 2, 2022, Williams saw Nurse Johnson in sick call for a dressing change. ECF No. 15-5 at 27. Nurse Johnson indicated that he ambulated without difficulty and denied pain, but she noted "moderate amount of yellowish slough obscuring base with no scabbing noted." *Id.* She emailed the on-site provider with a recommendation for a new dressing order. *Id.* at 28. Williams was seen by Physicians Assistant Ruth Campbell on September 8, 2022, who indicated the wound continued to "have exudate from the slowly closing wound," but indicated there were "no [overt] signs of infection" and planned to continue daily wound care, the use of crutches, and follow up appointments. *Id.* at 23. On September 11, 2022, Williams saw RN Becky Harley who noted a new "eraser sized pustule above laceration," but indicated there was serosanguinous discharge on the old dressing, no warmth, and no redness. *Id.* at 20-21. Daily dressing changes and monitoring were continued. *Id.* at 22.

On September 20, 2022, Williams saw Dr. Shyam Kurian for his orthopedics six-week post operative follow up appointment at Johns Hopkins. ECF No. 15-17 at 21-23. Williams' incisions were noted to be clean, dry and intact with no erythema, drainage, or signs of infection. *Id.* at 21. Radiographs ordered and reviewed by Dr. Kurian revealed that all hardware was in the proper place "without breakage or migration" and the fracture was "healing appropriately." *Id.* As to the "wound complication" Williams was experiencing, Dr. Kurian noted it was "likely secondary to a reaction to the superficial vicryl layer of sutures and should heal appropriately." *Id.* Dr. Kurian recommended follow up in four weeks. *Id.* at 22. Dr. Shafiq provided instructions to the facility for daily Clorpactin dressing changes until the wound healed, and progressively increasing Williams' weight bearing use of the leg. *Id.* at 23.

On January 14, 2023, CRNP Cyran reviewed Williams' chart, ordered a current knee x-ray, and submitted a consultation for physical therapy. ECF No. 15-4 at 26. The follow-up x-ray of Williams' knee occurred on January 17, 2023. ECF No. 15-17 at 18. This x-ray found no radiographic evidence of acute fracture, near-anatomic alignment, no lucency beneath hardware to suggest loosening, and no evidence of hardware failure. *Id.* at 18-19.

Williams has a physical therapy consultation on January 24, 2023, and the therapist recommended six to eight weeks of additional visits. ECF No. 15-4 at 20-22. On February 2, 2023, CRNP Cyran submitted the consultation request for additional physical therapy. *Id.* at 12-14. Williams then had multiple physical therapy appointments. ECF No. 15-3 at 20-37, 48-55; ECF No. 15-4 at 1-9.

On March 1, 2023, Williams was seen by NP Sharon N. Owens for a chronic care visit. ECF No. 15-3 at 41-47. Williams was still in an immobilizer and using crutches due to pain and ambulatory issues. *Id.* at 41. Owens noted minimal swelling laterally to the right knee, with no signs of redness or infection. *Id.* She concluded that this was a "very well-healed lateral right knee scar" with "no ankle or foot edema on [the right]" and "no signs of calf pain." *Id.* Owens reordered medications and added Voltaren gel to use with ibuprofen and Tylenol for pain management. *Id.* She submitted a consultation request for a follow-up with Johns Hopkins and obtained a record release from Williams to obtain the notes from the last visit to get clarification on the orthopedic surgeon's plan of care. *Id.* Physical therapy was to continue and follow up in chronic care was to occur in three months. *Id.*

Dr. Clem asserts that Williams' medical needs were "never ignored," his care was "timely and appropriate," his medication regimen "met the standard of care" and was "routinely adjusted . . . to address his pain complaints while also considering his objective presentation and being mindful of the risks of continued opioid use." ECF No. 15-2 at 20. Dr Matera states that he never told Williams that he could not go to the ER due to a policy because "there is no such policy," nor did he state that Williams should have been sent to the ER on the date of injury "because there was no reason to send him to the ER . . . as his condition was not an emergency." ECF No 15-18 at 2. He further explains that emergency surgery is only indicated in a compound fracture or an open fracture," which did not apply to Williams, and "[i]f he had been sent to the hospital, he would have been sent back to the facility and told to return as an outpatient." *Id.* at 4. CRNP Cyran agrees, noting she "never told the patient that he could not go to the ER because

of any policy, as there is no such policy," and she "never ignored or disregarded [Williams']
medical needs." ECF No. 15-19 at 2. Dr. Raab also attests that no such policy exists, Williams'
injury was not emergent, and he did not disregard Williams' medical needs. ECF No. 15-21 at 2-
3. He also indicates that "[g]enerally, the pain medication of choice for a fracture is not
narcotics, but ibuprofen and Tylenol." *Id.* at 3. He states that Percocet was provided in response
to Williams' complaints of pain, but generally, "if a patient with a leg fracture remains
nonweightbearing and on bedrest, there should be little pain."

Based on the forgoing evidence, Defendants argue that they did not violate Williams'
constitutional rights. ECF No. 15-1 at 30. Specifically, while they concede that Williams'
broken leg "created an objectively serious medical need," the evidence demonstrates that
"Medical Defendants were not deliberately indifferent to his medical needs." *Id.* at 30-31.
Further, they argue that there is no YesCare custom or policy which violated Williams'
constitutional rights. *Id.* at 31. They assert that Williams' needs were not ignored, his care was
timely and appropriate, and his medication regimen met the standard of care. *Id.* at 33. They
conclude that all Defendants are thus entitled to summary judgment. *Id.*

C.    **Williams' Reply**

Williams was notified of his right to respond to the Defendants' Motion pursuant to
*Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and indeed he did so on June 29, 2023.
ECF No. 20. In his response, he reiterates that he was "in a ton of pain from the time of surgery
and even after." *Id.* at 1. He again states that, following his initial injury, he was only provided
"crutches, an ace bandage, and [four] Motrin" and sent to his cell on the second floor with a top
bunk assignment. *Id.* at 2. When he returned to medical, he again asked to go to the hospital but
Nurse Johnson "did not think [he] need[ed] to be sent." *Id.* at 3. Nurse Johnson indicated the
swelling had improved, but Williams disputes this. *Id.* He states that "everyone from inmate to
prison guards believed my leg was broken just by the look of it and the obvious pain I was in, but
the trained medical professionals saw fit to make me wait and suffer, and believed that an ace
bandage and Motrin would do the trick." *Id.* He reiterates that he did not get x-rays until "10
days" after his injury. *Id.*

Williams argues that there were delays in his treatment, stating "on July 19, 2022, Dr.
Shafiq wanted to get the MRI done while I was in the hospital so that he could have me back in
immediately…but, instead I have to await approval and was sent to Tidal Health July 20th and

13

then from there wait for them to send it over to JHH ... as opposed to being immediately sent [on the date of the injury] to an emergency room where the entire process could have been done the same day." *Id.* at 5.  Williams also believes he should have been given an immobilizer sooner. *Id.*  He also questions that his providers "told me not to bear weight but then get up and move around" and that no one helped him "to the bathroom or the shower," he had to "manage on [his] own." *Id.*

Williams states he was not provided physical therapy until "almost 7 months after injury." *Id.* at 6.  He also stated he never received the follow up appointment that Dr. Shafiq recommended to occur four weeks after the September 20, 2022, appointment. *Id.*  He states that CRNP Cyran put in orders for regular icing of his knee which were not followed through on. *Id.* at 6.  He states that physical therapy was "only done for 11 sessions but approved for 12." *Id.*  Further, on March 21, 2023, his physical therapist recommended three additional weeks of treatment., but that did not occur. *Id.*

Williams reiterates his contention that his incision wound produced bad-smelling liquid. *Id.* at 8.  He also argues that even though x-rays are done twice a week,  they made him "wait until the next week to see an x-ray tech." *Id.*  Similarly, he questions the delay in getting to see a specialist at a hospital. *Id.* at 8-9.  He also argues that he was only returned to medical on June 28, 2022, because he "pressed the issue," and if he had not done so, "who knows how long they would have left [him] on a [second] floor tier in a top bunk." *Id.* at 9.

Williams raises here, for the first time, concerns about the quality of the nursing staff and the conditions in the infirmary. *Id.* at 11.  Williams seeks over half a million dollars in damages. *Id.* at 12.

### D.    Defendant's Reply

Defendants argue that Williams' lay opinion about the condition and treatment of his leg is insufficient to refute the opinion of medical doctors. ECF No. 22 at 1.  They further argue that Williams' "expectation for instantaneous treatment is unrealistic both in the prison setting and the outside world." *Id.* at 2.  They note that that "[t]he entire process from x-rays to surgery occurred in less than a month, which is extremely fast for the prison system which typically requires layers of approval for testing and surgery." *Id.*  Further, they argue that any delays in his treatment did not create a substantial risk of serious harm.  *Id.*  They argue that Williams' Response amounts to a disagreement over his care, which is insufficient to support a claim for

deliberate indifference. *Id.* at 3. Finally, they argue that "because he fails to address Medical Defendants' properly supported facts with citations to any evidence, this Court may consider Medical Defendants' facts undisputed for purposes of the summary judgment motion and grant summary judgment in favor of Medical Defendants." *Id.* at 3.

## II.    Standard of Review

In reviewing the amended complaint in light of a Motion to Dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the Court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained a "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Importantly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

While self-represented pleadings are liberally construed, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), this Court maintains an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

## III.   Analysis

### A.   The Medical Defendants

The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const, amend. VIII; *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein,* 825 F.3d 206, 218 (4th Cir. 2016). Notably, it "proscribes more than physically barbarous punishments." *Estelle*, 429 U.S. at 103. It also "embodies" the "'concepts of dignity, civilized standards, humanity, and decency . . .'" *Id.* (citation omitted). Thus, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

The Fourth Circuit has observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20

(1986)).  In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97.  Thus, the deliberate indifference standard is applicable here.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available.  *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition.  *See Farmer*, 511 U.S. at 839-40.  Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'"  *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison

official knew of a substantial risk from the very fact that the risk was obvious." *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842).

If the required subjective knowledge is established, a defendant may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)) *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (describing the applicable standard as an "exacting" one). "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked symptoms with the presence of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169. Mere negligence or malpractice does not rise to a constitutional level. *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle v. Gamble,* 429 U.S. 97, 106) (1976)); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) ("Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result."); *Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim . . . .")..

In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d

848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer v. Brennan, 511 U.S. 825, 837 (1994), aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.,* 621 F. App'x 732 (4th Cir. 2015); *see also Young v. Mt. Ranier,* 238 F.3d 567, 575 (4th Cir. 2001).

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *United States v. Clawson,* 650 F.3d 530, 538 (4th Cir. 2011) (emphasis added) (quoting *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977)). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3d Cir. 1970)); *accord Jackson v. Lightsey,* 775 F.3d 170, 178 (4th Cir. 2014) ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference.").

Nurse Johnson, Dr. Clem, Dr. Metera, Dr. Raab, and CRNP Cyran, collectively the Medical Defendants, do not contest that Williams suffered an objectively serious medical need. ECF No. 15-1 at 30-31. Thus, liability for these Defendants turns on whether their actions and treatment of Williams amounted to deliberate indifference. The record evidence presented in this case demonstrates that they were not deliberately indifferent to Williams' serious medical needs.

The record reflects that, following his injury, Nurse Johnson examined Williams. ECF No. 15-13 at 61. His vital signs were stable, and he had positive capillary refill in his right big toe. *Id.* She ace wrapped and iced the leg, provided Motrin along with four additional doses for later use, and provided crutches. ECF No. 15-14 at 1. The following day, Nurse Johnson evaluated Williams, re-wrapped the knee, and provided Motrin and Tylenol. ECF No. 15-13 at 60. Thereafter, she again evaluated Williams and his vital signs were stable and swelling had decreased. *Id.* at 58. She noticed new right heel discoloration, which is a sign of an injury, so she contacted Dr. Paul Matera and asked him to see the patient. ECF No. 15-20 at 4. Nurse Johnson attests that as a nurse, she cannot send a patient to the hospital, order x-rays, or prescribe medications beyond over-the-counter pain medications. *Id.* at 2. Further, she avers that she did not believe the leg was broken based on her evaluation of the patient and proceeded accordingly.

The record reflects that Nurse Johnson evaluated Williams and responded reasonably based on her evaluation. She provided medication for pain management, an ace wrap for stabilization, and ice for swelling. The record supports that she "responded reasonably to the

risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. As such, she was not deliberately indifferent to Williams' needs and she is entitled to summary judgment in her favor.

As to Defendants Dr. Clem, Dr. Metera, Dr. Raab, and CRNP Cyran, the record, fully recounted above, reflects that these providers routinely met with and examined Williams. *See supra* Section I.B. Williams' medications were frequently adjusted in response to his complaints of pain. *Id.* Additionally, requests for imaging, follow up appointments, CT scans, and surgery were timely placed by the providers. *Id.* Williams had surgery approximately one month after his injury and spent the majority of his time prior to surgery in the infirmary receiving pain medications and close monitoring. Further, Williams remained in the infirmary following surgery for his recovery. Based on the record, the Court cannot find that these Defendants were deliberately indifferent to Williams' needs stemming from his broken knee.

While the Court is sympathetic to Williams' position, the evidence before the Court demonstrates that the fracture was not an emergency situation requiring immediate x-ray. As noted, Williams was provided analgesics and ambulatory aids while medical providers awaited diagnostic testing. Once the diagnostic testing was received, he was quickly provided an orthopedic consultation. There is no evidence that the delay created a risk of harm. Moreover, while medical providers awaited the x-ray, he was moved to the infirmary where he received additional analgesic medication and close monitoring. Accordingly, summary judgment in favor of the Medical Defendants is appropriate in this matter.

As to allegations that the Medical Defendants were deliberately indifferent to a post-surgical infection, the record reflects that the wound was not infected, and timely and appropriate care was rendered to manage any secretions or discharge from the wound. Finally, while there does appear to have been a delay in Williams' physical therapy appointments, Williams did receive physical therapy, and the record does not reflect that any delay in treatment exacerbated Williams' injuries or hindered his recovery. As such, the Medical Defendants are entitled to summary judgment.

### B. Yes Care Corp.

Williams named Yes Care Corp. as a Defendant. In the case of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that local governmental entities may be liable under § 1983 based on the unconstitutional actions of

individual defendants where those defendants were executing an official policy or custom of the local government that violated the plaintiff's rights. *Id.* at 690-91.  Of import here, *Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers. *See, e.g.*, *West*, 487 U.S. at 49; *Polk*, 454 U.S. at 320; *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999).  A viable § 1983 *Monell* claim consists of two components: (1) the municipality or private entity had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).  The record does not support that Yes Care Corp. maintained any unconstitutional policy or custom, and thus Yes Care Corp. is entitled to summary judgement.[1]

## IV.     Conclusion

By separate Order which follows, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 15), construed as a motion for summary judgment, shall be **GRANTED.**

February 12, 2024
Date

LYDIA KAY GRIGGSBY
United States District Judge

---

[1] The Court notes that Defendant "ECI Medical" was not served in this matter.  However, Williams' Complaint contains no specific allegations regarding this Defendant.  He has, therefore, failed to state a claim against ECI Medical.  The Court is obligated by 28 U.S.C. § 1915A to screen prisoner complaints and dismiss any complaint that is "frivolous, malicious or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b).  As such, ECI Medical is dismissed without prejudice.